J-A18040-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| VERNON LEE SINGER, | : | |
| | : | |
| Appellant | : | No. 1122 MDA 2014 |

Appeal from the Judgment of Sentence entered on July 1, 2014
in the Court of Common Pleas of Cumberland County,
Criminal Division, No. CP-21-CR-0003274-2013

BEFORE: FORD ELLIOTT, P.J.E., STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED NOVEMBER 13, 2015**

Vernon Lee Singer ("Singer") appeals from the judgment of sentence

imposed following his conviction of resisting arrest, and the summary

offense of public drunkenness.[1] We affirm in part and vacate in part.

The trial court summarized the facts underlying the instant appeal as

follows:

> About 1:00 a.m.[,] on the morning of August 23, 2013[,]
> Pennsylvania State Troopers [Kory Wardrop ("Trooper Wardrop")
> and Keith Rudy ("Trooper Rudy")] were dispatched to a
> residence in South Hampton Township, Cumberland County,
> Pennsylvania[,] for a domestic disturbance. They were advised
> that [Singer] was intoxicated and verbally abusive toward his
> family.
>
> When the troopers arrived[, Singer] was no longer at the
> residence. His family was concerned that he might try to harm
> himself. Consequently[,] the troopers and family members
> began to search the area. While the area is wooded and rural,

---

[1] 18 Pa.C.S.A. §§ 5104, 5505.

there are other residences scattered around. The nearest residence is within shouting distance.

After about an hour of searching the area without results, the troopers gave up and left. Shortly after leaving[,] they received another call from the family. This time[,] they were told that [Singer] was banging on the window, holding a hatchet/axe[,] and threatening to kill himself. Troopers Wardrop and Rudy returned to the scene along with their corporal, Chester Dabrowski ["Corporal Dabrowski"]. Shortly thereafter[,] two other troopers joined them.

Before the troopers arrived[, Singer] fled back into the woods. Trooper Wardrop called [Singer] on his cell phone as Corporal Dabrowski and Trooper Rudy canvassed the area. [Singer] told Trooper Wardrop that he intended to kill himself. The two other officers were able to locate [Singer] from the light on his cell phone. However, when they got close to [Singer,] he put the hatchet to his throat, telling the troopers not to come any closer. As they yelled at him to drop the axe, [Singer] took off through the woods and into a cornfield.

The troopers split up to search for [Singer]. Trooper Rudy entered the cornfield with one of [Singer's] nephews, hoping to find his trail by following corn that had been knocked down. Trooper Rudy noticed the odor of alcohol just as [Singer] jumped up[,] startling the trooper and his nephew. [Singer] again disappeared into the corn field with hatchet in hand.

After searching for an hour and twenty minutes[,] the Corporal decided to wait until daylight so that a helicopter could be used to assist them. The five troopers and various family members regrouped back at the residence. At that point[,] someone spotted [Singer] in the yard of a neighboring residence. As the troopers got near to [Singer], he lifted the hatchet to his neck yet again. Four of the five troopers were forced to tase [Singer], with no apparent effect. They then had to tackle him in order to get him into custody.

Once [Singer] was in custody[,] it was apparent that he was intoxicated. He reeked of alcohol and his eyes were bloodshot and glassy. Furthermore, [Singer] had a B.A.C. of 0.075% several hours after he had stopped drinking. He was taken to crisis intervention and eventually committed to a

psychiatric facility for treatment. The instant charges[, disorderly conduct,[2] public drunkenness and resisting arrest,] were filed several weeks later[,] on November 1, 2013.

Trial Court Opinion, 11/6/14, at 1-3 (footnote added).

A jury acquitted Singer of disorderly conduct, but convicted Singer of resisting arrest. Additionally, the trial court found Singer guilty of the summary offense of public drunkenness. The trial court subsequently sentenced Singer to probation for his conviction of resisting arrest, and to pay the costs of prosecution for his conviction of public drunkenness. Thereafter, Singer filed the instant timely appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.

On appeal, Singer presents the following claim for our review:

Was the evidence presented at trial sufficient to sustain a conviction on any of the charges[,] when the evidence showed that the Commonwealth failed to prove all [of] the elements for each offense beyond a reasonable doubt?

Brief for Appellant at 5.

Singer argues that the Commonwealth's evidence is insufficient to prove the crime of resisting arrest. *Id.* at 13. Specifically, Singer argues that his resisting arrest conviction cannot be sustained because his underlying arrest (for disorderly conduct and public drunkenness) was unlawful. *Id.* at 14. According to Singer, "police cannot lawfully arrest someone under 'some form of generalized probable cause' standard." *Id.* at 15 (quoting *Commonwealth v. Wertelet*, 696 A.2d 206, 209 n.5 (Pa.

---

[2] 18 Pa.C.S.A. § 5503.

- 3 -

Super. 1997)). In this regard, Singer asserts that the officers failed to prove that he appeared in any "public" area, manifestly under the influence of alcohol or a controlled substance, as required by statute. Brief for Appellant at 15.

We review a challenge to the sufficiency of the evidence under the following standard of review:

> A claim challenging the sufficiency of the evidence presents a question of law. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (Pa. 2000). We must determine "whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt." *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1267 (Pa. 1989). We "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict." *Id.*

*Commonwealth v. Thomas*, 65 A.3d 939, 943 (Pa. Super. 2013).

> [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Id.* (quoting *Commonwealth v. Ratsamy*, 594 Pa. 176, 934 A.2d 1233, 1236 n.2 (Pa. 2007)).

The Crimes Code defines the crime of resisting arrest as follows:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful

- 4 -

arrest *or discharging any other duty*, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S.A. § 5104 (emphasis added).

Contrary to Singer's assertions, the provisions of section 5104 are "clearly disjunctive." **In Interest of Barry W.**, 621 A.2d 669, 673 (Pa. Super. 1993) (citing **Commonwealth v. Karl**, 476 A.2d 908, 911 (Pa. Super. 1984)). To be convicted under the latter portion of section 5104, there must be a "discharge of any other duty[,]" within the meaning of the statute. **Barry W.**, 621 A.2d at 673 (quoting 18 Pa.C.S.A. § 5104). As explained in **Karl**, section 5104 was modeled after section 242.2 of the Model Penal Code:

> The Model Penal Code § 242.2 comment 5 (Official Draft and Revised Comments 1980), which deals with the physical obstruction of discharge of public duty, states:
>
> > Section 242.2 covers physical interference in a host of circumstances in which public servants *discharge legal duties other than arrest*. These include, for example, a policeman executing a search warrant, a fireman putting out a blaze, a forest or agricultural official making required inspections, an election official charged with monitoring balloting, and the like.

**Karl**, 476 A.2d at 103 (emphasis in original). Thus, we review the record to determine whether Singer interfered with the officers' discharge of legal duties other than arrest.

Our review of the record discloses that at trial, Trooper Wardrop testified that on August 23, 2013, while working the midnight shift with

Trooper Rudy, he was dispatched to 25 Gutshall Road in Southampton Township, for a domestic dispute. N.T., 5/12/14, at 8-10. After speaking with Paula Black ("Black"), Singer's sister, Troopers Wardrop and Rudy canvassed the area, searching for Singer, who purportedly was intoxicated. *Id.* at 10. After an unsuccessful search for Singer, the troopers left the scene, advising family members to contact them if Singer returned. *Id.* at 13.

At about 2:10 a.m., family members reported that Singer had returned to the residence and, with a hatchet in his hand, "was banging on the trailer windows from the outside." *Id.* Upon their arrival, the troopers were told that Singer fled when he saw the police vehicle. *Id.* at 14. Thereafter, Corporal Dabrowski arrived at the scene and assisted in the search for Singer. *Id.* Trooper Wardrop testified that when he called Singer's cell phone, Singer answered, and threatened to kill himself. *Id.* At trial, Corporal Dabrowski testified as to the reasons for arresting Singer:

Q. [The Commonwealth]: … [W]hat were you going to be arresting [] Singer for?

A. [Corporal Dabrowski]: At that point[,] it was disorderly conduct and once we found he was intoxicated, public drunkenness.

Q. Or discharging any other duty. What else were you trying to do besides arrest him and take him into custody?

A. Well, part of our issue was he had threatened to kill himself, so we wanted to get him crisis [*sic*].

Q. So you're trying to save his life?

- 6 -

A. Save his life, yes.

*Id.* at 38.

Thus, the record reflects that the Commonwealth presented sufficient evidence to establish that Singer, "with the intent of preventing a public servant from … discharging any other duty," created a "substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance." 18 Pa.C.S.A. § 5104. Accordingly, we cannot grant Singer relief on his challenge to the sufficiency of the evidence underlying his conviction of resisting arrest.

Singer also challenges the sufficiency of the evidence underlying his conviction of public drunkenness. Brief for Appellant at 14. Specifically, Singer claims that "the uncontradicted evidence shows that the events did not occur in a public place[,] within the meaning of the Crimes Code." *Id.* at 16. We agree.

The Crimes Code defines the summary offense of public drunkenness as follows:

> A person is guilty of a summary offense if he appears **in any public place** manifestly under the influence of alcohol … to the degree that he may endanger himself or other persons or property, or annoy persons in his vicinity….

18 Pa.C.S.A. § 5505 (emphasis added). Section 5505 does not define the term "public." However, in **Commonwealth v. Meyer**, 431 A.2d 287 (Pa. Super. 1981), this Court observed that

> [t]he term does appear, however, in two places in the Crimes Code: in the section dealing with prostitution, section 5902, and in the section dealing with disorderly conduct, section 5503. Section 5902(f) defines it as "any place to which the public or any substantial group thereof has access." The ordinary meaning of "access" is: "the right to enter or make use of;" "the state or quality of being easy to enter."
>
> Section 5503(c) defines public places as, *inter alia*, "any premises which are open to the public."

**Meyer**, 431 A.2d at 289 (footnotes omitted). In **Meyer**, this Court deemed the evidence insufficient to establish the "public" element of public drunkenness, where the altercation took place at a V.F.W. Post, a private club to which the public did not have access. **Id.**

Our review of the record, in a light most favorable to the Commonwealth, discloses insufficient evidence to establish the "public" element of public drunkenness. Regarding his search for Singer, Trooper Wardrop described the area to be searched as follows:

> It's a remote area. There's a trailer that sits at the front of the trailer [*sic*]. The trailer door faces the road. Behind that is a very short backyard with, I believe, a tall fence.
>
> Behind the fence is a very open, grassy area. On the other side of the grass[y] area is a wooded area. To the … north side of the residence, there is a corn field and other wooded areas.

N.T., 5/12/14, at 10-11. According to Trooper Wardrop, the area was not developed. **Id.** at 11.

Trooper Wardrop described hearing Singer "going through some type of brush or corn …." *Id.* at 15. Trooper Wardrop additionally described Singer walking from the back of his own residence to the front, and then "around the back of the residence, around the fence, into the big open grass area." *Id.* at 16. Finally, Trooper Wardrop described Singer as running toward a wooded area. *Id.* at 17-18.

Trooper Rudy testified that he had observed Singer "hiding in a tree line next to a cornfield[,]" about 150 yards from the residence. *Id.* at 26. Trooper Rudy stated that he chased Singer behind the tree line, into a cornfield, through the yard of another residence, and finally into a wooded area. *Id.* at 26, 28, 30.

In his testimony, Corporal Dabrowski stated that about 150 yards from the trailer,

> there was a small wooded area. There's actually a couple other residences scattered[,] or cabins or something[,] scattered throughout there. As we're walking towards this cornfield, there's an open area and there's a road and then there's a tree line. On the other side of the tree line is a big cornfield.

*Id.* at 35. According to Corporal Dabrowski,

> … I think we both gave him verbal commands to come out of the wood line. … [Y]ou could hear him running through the brush.
>
> And there's like a little gully there or whatever to catch water, so we didn't pursue him through that. It was rather thick. You could hear him running, and we realized the other side was cornfield, and the corn at that time was probably seven feet high.

- 9 -

So then … I decided I would flank the hedge row in case he came back out. There was an open area. Trooper Rudy and the young man, I don't know his name, went around. They had to actually go around the hedge row where the cornfield began to go inside the cornfield [*sic*].

***Id.*** at 36.

The above evidence, even taken in a light most favorable to the Commonwealth, fails to establish the "public" element of the summary offense of public drunkenness. Thus, we vacate the judgment of sentence imposed for Singer's conviction of public drunkenness.

Accordingly, we affirm Singer's judgment of sentence as to his conviction of resisting arrest, but vacate Singer's judgment of sentence as to his conviction of public drunkenness.

Judgment of sentence for resisting arrest affirmed; judgment of sentence for public drunkenness vacated. Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2015